UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JON JON'S INC., VICTORIA
CERRITO, MASOUD SESI and
NANCY HAKIM,

                Plaintiffs,

                                       CASE NO. 10-CV-12516

v.                               HONORABLE GEORGE CARAM STEEH

CITY OF WARREN,

                Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises out of defendant City of Warren's denial of the transfer of a liquor license involving the now defunct strip club, Jon Jon's, Inc. ("Jon Jon's"). Now before the court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion shall be granted as to the federal constitutional claims, and the court shall remand the supplemental state law claims to the Macomb County Circuit Court.

### I. Background

Plaintiff Jon Jon's was an adult entertainment establishment featuring topless dancing located in Warren, Michigan. At the time the Complaint was filed, plaintiff Victoria Cerrito had owned Jon Jon's for 25 years. (Doc. 1 at ¶ 7). In 1986, Warren changed its zoning ordinances to prevent the secondary effects of sexually oriented businesses. (Doc. 91-2). The new ordinance would have prevented Jon Jon's from operating at its current location because it was within 750 feet of a residential area, *id.*, but Jon Jon's was granted

-1-

non-conforming use status, and so was allowed to continue operating its business there. In order to retain its non-conforming use status, Jon Jon's was prohibited from making improvements constituting more than 30 percent of its listed value. (Doc. 91-8 at 7 quoting Section 4.17(c) of the Zoning Ordinance). According to council member and former defendant, Mark Liss, the reason for the restriction was to phase out the nonconforming use status over time. (Doc. 91-13 at 16).

In the spring of 2008, Cerrito planned to sell Jon Jon's in its entirety to plaintiff Masoud (Mark) Sesi because the business was in need of a substantial make over to survive, and she could not afford to undertake the needed renovations. (Doc. 1 at ¶¶ 10-11). Cerrito and Sesi entered into a purchase agreement for $1.3 million. (Doc. 91-3 at 29). Sesi paid Cerrito about $500,000 up front, of which $100,000 went to purchasing a 9 percent stake in Jon Jon's. (Doc. 91-7). Cerrito transferred 9 percent of the stock to Sesi on December 1, 2008. *Id.* Because she transferred less than ten percent, Cerrito did not need approval from local law enforcement and the local legislative body. (Doc. 1 at ¶ 14). Cerrito then resigned, effective immediately, and Sesi became Jon Jon's president, secretary, and treasurer. (Doc. 91-7 at 5). Sesi was to pay the remainder of the $1.3 million after the transfer of the remaining 91 percent of the stock was approved by the Warren City Council. (Doc. 91-3 at 29).

Through his counsel, Cecil St. Pierre, Sesi obtained a variance to install a walk in cooler and to raise the roof height in January, 2009. (Doc. 91-8 at 8). In April, 2009, Cerrito sought to transfer the remaining 91 percent of Jon Jon's stock to Sesi. (Doc. 1 at ¶ 15). Transfer required approval from the Warren police and Warren City Council. In August, 2009, the Warren Police Commissioner recommended against the transfer

-2-

application based on Sesi's long history of liquor code violations at Cheetah's, a strip club in Detroit which Sesi owned. Before the City Council considered the transfer application, Sesi withdrew his request, because he believed that his efforts to obtain City Council approval would be futile. (Doc.1 at ¶ 22).

A few words about Sesi's involvement in Cheetah's is warranted here. In 2002, Sesi, through his company, BFC Management, purchased that sexually oriented business serving alcohol in Detroit. (Doc. 91-3 at 14, 19). From 2005 to 2007, Cheetah's was charged with numerous liquor license violations, including allowing dancers to touch patrons' genitals and selling alcohol to minors. (Doc. 91-6). Cheetah's also attracted national attention based on human trafficking that occurred at its club where three Ukranian women were forced to strip against their will. (See Criminal Complaint, Doc. 91-5). According to Sesi's e-mail in 2009, the NBC Today Show covered the story of sex trafficking at Cheetah's. (Doc. 98, Ex. 1). Sesi was never indicted on the charges of human trafficking, and no evidence links him to the criminal activity. Plaintiffs argue that because the criminal complaint involving sex trafficking at Cheetah's (Doc. 91-5) was not filed until 2013, and Sesi was never involved in the trafficking or convicted of any crime, any consideration of alleged criminal activity taking place at Cheetah's would not support defendant's motion for summary judgment. (Doc. 98 at 4). It is not disputed, however, that the alleged human trafficking taking place at Cheetah's was reported nationally prior to 2009. Also, Liss testified that one of Cheetah's dancers testified before the United States Congress about human trafficking. (Doc. 91-9 at 34-35).

As soon as Sesi took over Cheetah's, Sesi hired his nephew Lahkman (Luke) Al-Hakim to work at Cheetah's. (Doc. 91-3 at 25). Al-Hakim works at Cheetah's five nights

a week.  *Id.*  Early on, Al-Hakim earned about $1,000 a week for his work at Cheetah's; he now is paid $4,000 per week.  *Id.* at 25-26.  At some point, the exact date is unclear from the record, Al-Hakim purchased the property on which Cheetah's sits.  (Doc. 91-4 at 29). Sesi now pays Al-Hakim rent in the amount of $17,000 per month. (Doc. 91-4 at 29-30). Also, in the summer of 2009, Al-Hakim, though his company Warren Property Investments, purchased the property on which Jon Jon's is located.  (Doc. 91-4 at 40, 47-48.)

One month after Sesi withdrew his transfer request, on October 20, 2009, Sesi sold his interest in Jon Jon's to plaintiff Nancy Hakim for $5,000, which was only a small fraction of what he had paid Cerrito less than ten months earlier.  (Doc. 91-11).  Hakim is Sesi's niece (Doc. 91-13 at 15, Doc. 91-4 at 19) and Al-Hakim's sister.  (Doc. 91-3 at 52). That same day, Hakim also entered into a stock purchase agreement to buy Cerrito's 91 percent interest in Jon Jon's, subject to approval of the Michigan Liquor Control Commission ("MLCC"), for $650,000.  (Doc. 91-12).  Based on the significant cost difference between what Sesi paid to purchase Jon Jon's stock and the price for which he sold it to Hakim some ten months later, defendant argues the sale to Hakim was not an arm's length transaction, and that Hakim was really a front person for Sesi and would repay him the additional $500,000 he had paid to Cerrito once Hakim obtained a loan secured, in part, by Cheetah's collateral.  (Doc. 100-1 at 10) (Doc. 91-3 at 65).

The Warren City Police Commissioner recommended that the MLCC grant Hakim's transfer request.  (Doc. 98, Ex. 8).  In January, 2010, Jon Jon's applied to the City Council for approval of the stock sale transfer of the 91 percent sale of Cerrito's interest and 9 percent sale of Sesi's interest to Hakim.  (Doc. 1 at ¶ 25).  Jon Jon's closed on April 22, 2010 to begin renovations.  (Doc. 91-3 at 35).  About a week later, on April 27, 2010, the

motion to approve the stock transfer to Hakim was heard by the City Council.  (Doc. 91-13 at 13-18).  At the City Council meeting, Hakim was presented by attorney Cecil St. Pierre, (Doc. 91-13 at 14-15),  the same attorney who had represented Sesi.  Hakim's brother, Al-Hakim, paid St. Pierre, and St. Pierre did not speak to Hakim prior to representing her. (Doc. 91-10 at 33).  At her deposition, Hakim testified that if her transfer application was granted, she did not intend to operate Jon Jon's herself, but that her brother, Al-Hakim, would handle everything.  (Doc. 91-10 at 22-23, 34).  Hakim testified that she is jobless, mostly stays home, rarely goes outside, and primarily cares for her elderly mother.  (Doc. 91-10 at 7, 12, 18; 91-3 at 53).  She also testified that she had previously owned a liquor store in Detroit and a banquet facility in Southfield, but testified that her brother ran those businesses.  (Doc. 91-10 at 9-11, 13).  Hakim also testified that she now owns an interest in an adult entertainment business, King of Diamonds, in Detroit, but did not know what percentage of shares she owns, her brother takes care of everything, and she has never been to the club.  (Doc. 91-10 at 16-17).

At that City Council meeting, Liss expressed concerns that Sesi would be involved in Jon Jon's operations, and that the $800,000 in improvements anticipated by Jon Jon's would destroy the strip club's non-conforming use status.  *Id.* at 16.  The President of Central Homeowners of Warren ("CHOW") appeared and expressed concern that Sesi would be involved in the operation of Jon Jon's.  *Id.* at 15.  Hakim's counsel represented that the transfer would eliminate Sesi as a minority shareholder and offered to put a written restriction on the stock certificates stating that Sesi would never be a shareholder in Jon Jon's.  *Id.* at 14-15.  The City Council voted 5-4 to deny the transfer application.  *Id.* at 18. The Council did not issue a formal written decision outlining its reasons for the denial, but

the meeting minutes set forth Liss' objections and the concerns of other council members as stated at the meeting.  *Id.* at 13-18.

Liss' concerns appear to have been well founded.  There is indeed a link between Hakim and Cheetah's (now known as Ace of Spades).  At the council meeting, St. Pierre stated that "a loan from a Chicago bank would finance the transaction and the improvements."  (Doc. 91-13 at 16).   As was later revealed, Cheetah's mortgage, assignment of rents and UCC-1 filings, were the collateral for the loan Hakim sought to finance the sale and the improvements of Jon Jon's.  (Doc. 91-3 at 62; Doc. 91-14 at 1).[1] Plaintiffs assert that the fact that Cheetah's mortgage, assignment of rents, and UCC-1 filings were the collateral for the loan to renovate Jon Jon's is irrelevant because plaintiffs never accepted the loan, but the fact remains that Hakim, through her connections with her brother Al-Hakim and uncle Sesi, was connected to Cheetah's.  Before the City Council, attorney St. Pierre stated that Sesi would not run Jon Jon's but its current manager, Kelly Sanders, who had run the business for 20 years, would continue to do so.  (Doc. 91-13 at 16).  Hakim testified, however, that her brother Al-Hakim would operate Jon Jon's and that she had never met and did not know Sanders.   (Doc. 91-10 at 22-23).  It is not disputed that Al-Hakim owns the property where Cheetah's sits (Doc. 91-4 at 29), and is intimately involved in the club's operations, now earning $4,000 per week for his labors there. (Doc. 91-3 at 25-26).  Al-Hakim testified that he works as a manager at Ace of Spades, formerly

---

[1]Defendant argues that the Cheetah assets were the sole collateral for that loan, (Doc. 100-1 at 12) but that is not true.  Also listed as collateral were all real estate, fixtures, and equipment of Jon Jon's.  (Doc. 91-14).

known as Cheetah's. (Doc. 91-4 at 15).[2] Thus, Liss' concerns linking Hakim to Cheetah's were well founded.

Liss' concerns that Jon Jon's would lose its non-conforming status if it went forward with renovations for which it had budgeted $800,000 also proved true. Although Jon Jon's had been awarded a variance to add a new cooler and raise its roof height in approximately 2009, Jon Jon's nearly demolished the gentlemen's club, gutted the place, and left only a few walls and a concrete slab remaining. (Doc. 91-16). As a result, on August 18, 2010, the City's Chief Zoning Inspector informed Jon Jon's that it had lost its nonconforming use status due to the unapproved demolition. (Doc. 70 at 3).

Jon Jon's appealed to the Zoning Board of Appeals ("ZBA"). *Id.* While that matter was pending, the City filed a declaratory judgment action with the Macomb County Circuit Court seeking a ruling that Jon Jon's lost its nonconforming use zoning status because of the unauthorized changes it made. *Id.* Plaintiffs filed a counterclaim raising the same constitutional claims asserted in this federal lawsuit. *Id.* The ZBA affirmed. *Id.* Jon Jon's then amended their counterclaim to appeal the ZBA's decision. *Id.* The Macomb County Circuit Court affirmed the ZBA's decision that Jon Jon's had lost its status as a nonconforming use, finding, that it was "not presented with a minor oversight; rather, the conduct complained of, and the degree of deviation by Jon Jon's, is substantial, intentional and flagrant." *Id.* at 4. The state court did not address plaintiffs' constitutional claims on the merits. *Id.* at 8-9.

---

[2]Contrary to Al-Hakim's testimony, Sesi testified that Al-Hakim was not a manager of Cheetah's, but that Al-Hakim watches over the bar and the inventory. (Doc. 91-3 at 25).

Plaintiffs allege council member Liss sabotaged their efforts to gain transfer approval on the Hakim application for racist reasons. What did Liss do? He contacted the MLCC and asked the Commission to investigate why Jon Jon's failed to report a transfer of nine percent of the stock of Jon Jon's to Sesi as required by law. (Doc. 98, Ex. 9-10). He posted his letter to the MLCC on his website (Doc. 98, Ex. 11) and also posted on his website the fact that Hakim was seeking to purchase Jon Jon's. (Doc. 98, Ex. 1). On March 8, 2010, Liss posted a webpage reciting Cheetah's liquor code violations and the criminal activity taking place there and asking whether Jon Jon's would become the new Cheetah's. (Doc. 98, Ex. 12). He opposed the transfer at the City Council meeting based on concerns Sesi would be involved, and that Jon Jon's was about to undergo an $800,000 renovation that would destroy its nonconforming use status. (Doc. 91-13 at 16).

As should be obvious by now, the procedural history of this case, which now spans six years, is somewhat complicated. A little more detail should flesh out the matter. The parties have been involved with litigation over Jon Jon's on two tracks: this federal matter, and the state case challenging the loss of nonconforming use status, referenced above, pending at the same time. This federal case was actually filed first, albeit in state court. Prior to losing its nonconforming use status, on June 1, 2010, plaintiffs filed a seven-count Complaint in Macomb County Circuit Court which defendant removed here.[3] Counts I and II raise state law claims challenging the denial of the transfer application and seeking a writ of mandamus ordering the City to transfer the liquor license to Hakim. Plaintiffs have agreed to dismiss the state law claim pled in Count III. (Doc. 98 at 12). Counts IV through

---

[3]At that time, council member Mark Liss was also a defendant and joined in the removal.

-8-

IX state 42 U.S.C. § 1983 claims for alleged constitutional violations of procedural and substantive due process, violations of the freedom of speech and expression, and race discrimination.

This case was previously assigned to the Honorable Julian A. Cook.  Judge Cook stayed this case pending the related state law appeal of the ZBA's decision.  Upon entry of the Macomb County Circuit Court's judgment affirming the ZBA, the City moved for summary judgment in this federal suit.  Judge Cook granted summary judgment for the City on the basis of res judicata.  (Doc. 66).  The Sixth Circuit reversed, holding that the Macomb County Circuit Court did not adjudicate plaintiffs' constitutional claims against the City on the merits, and the Michigan Court of Appeals did not recognize or consider plaintiffs' separate constitutional claims against the City.  (Doc. 70).  Following Judge Cook's retirement, this matter was only recently reassigned to this court.  After both sides engaged in additional discovery, the City filed its motion for summary judgment, this time, on the merits.  The matter has been fully briefed and both sides have submitted voluminous exhibits which this court has combed and carefully considered.  The court previously advised the parties that it would decide this matter based on the written submissions pursuant to Local Rule 7.1(f)(2), and neither side has voiced any objection to proceeding in that fashion.

## II. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or

-10-

denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

### A. Dismissal of Defendant Mark Liss

On November 16, 2010, pursuant to the parties' stipulation, the court entered an order dismissing defendant Mark Liss as defendant from the case caption. (Doc. 29). In its order granting summary judgment, the court noted that Liss had been dismissed as a party:

> The complaint originally identified two Defendants; namely, the City and Mark Liss, a member of its City Council. However, pursuant to the parties' stipulation, the Court entered an order on November 16, 2010 which dismissed Liss as a party to this case.

(Doc. 66). Now, plaintiffs claim they never stipulated to Liss' dismissal, or that the Sixth Circuit's decision reversing summary judgment for defendant City of Warren somehow resurrected their lawsuit against Liss. Not so. If plaintiffs took issue with Liss' dismissal, the time to do so was in a motion for reconsideration or on appeal. Having done neither, Liss was properly dismissed, and there is no basis for reinstating those claims now, some five years later.

### B. Mootness

The City argues that plaintiffs' constitutional claims are moot because Jon Jon's lost its nonconforming use status when it demolished its establishment and thus, is barred from operating an adult entertainment business at its current location. Moreover, the City

argues that plaintiffs' constitutional claims are also moot because in September, 2010, the City passed an ordinance proscribing alcohol in sexually oriented businesses.  Plaintiffs' claims are not moot.  This court previously considered and rejected this same argument. (Doc. 66 at 7-8).  Plaintiffs filed their Complaint in June, 2010, for alleged constitutional violations occurring in April, 2010.  Plaintiffs seek nominal and compensatory damages. Although the loss of Jon Jon's nonconforming use status, or loss of its ability to serve alcohol while providing adult entertainment, which took place less than six months after Hakim's transfer application was denied, would likely limit any award of compensatory damages, these subsequent events do not moot plaintiffs' claims.  Plaintiffs' claims for nominal and compensatory damages remain viable, and the court will address the City's motion for summary judgment on the merits.

**C.  Parole Evidence**

In discussing their state law claims, plaintiffs argue this court may only consider the minutes of the April 27, 2010 City Council meeting where the Council voted to deny a liquor license to Hakim, and may not consider any other evidence, which it describes as "parole" evidence.  It is unclear if plaintiffs assert the same rule with respect to their constitutional claims.  Should they mean to do so, the argument lacks merit.  Plaintiffs' theory applies in the context of contract law, but is wholly inapposite to the constitutional claims at issue here.  The two cases plaintiffs rely upon fail to support their theory.  In *46th Circuit Trial Ct. v. Crawford Co.*, 266 Mich. App. 150, 161 (2005), *rev'd on other grounds*, 476 Mich. 131 (2006), a breach of contract case, the court ruled that in determining whether or not the county board accepted a pension plan, the court could not consider affidavits of county commissioners, but only on the official minutes and resolutions of the board.  Similarly, in

*Stevenson v. Bay City*, 26 Mich. 44, 46 (1872), an action to recover against a surety of a municipal bond, the court rejected plaintiff's attempt to prove that an ordinance fixing the duties of the controller was passed by less than a majority of alderman, holding that the official records of the city could not be varied by parol evidence. Unlike those cases, here, plaintiffs challenge on constitutional grounds the denial of a transfer of a liquor license. In passing on those constitutional questions, neither plaintiffs nor defendant are limited to the official records of the council meeting where the transfer of the liquor license was denied.

**D. 42 U.S.C. § 1983 Claims**

Plaintiffs bring § 1983 claims alleging that the City: (1) denied them substantive and procedural due process through its enforcement of a liquor-control statute, (2) violated their right to free speech and expression, and (3) denied them equal protection and substantive due process on the basis of race. For the reasons set forth below, the City is entitled to summary judgment on all claims.

**1.      Substantive and Procedural Due Process**

Plaintiffs claim that the City violated their substantive due process rights because no municipal ordinances existed to set forth appropriate standards for determining their transfer application. Plaintiffs further claim that the City violated their procedural due process rights because the council did not perform a full-fledged evidentiary hearing, and made no oral or written findings setting forth the reason for the denial. It is undisputed, however, that plaintiffs had notice of the council's consideration of the transfer application, and had an opportunity to be heard at the council meeting where the issue was addressed.

-13-

Hakim was represented by her attorney who appeared on her behalf at the council meeting, and he spoke at length in favor of Hakim's application.

There are two steps for determining due process claims.  The first step is to "determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment." *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  If not, the court does not reach the second step, which is to determine whether the deprivation of that interest contravened the notions of due process.  *Id.* (citing *Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972)).  In this case, the analysis begins and ends at the first step.

None of the plaintiffs have shown a constitutionally recognized property interest in Hakim's application for the transfer of Cerrito's liquor license.  It is true that Michigan courts have recognized that the holder of a liquor license has a constitutionally protected property right that cannot be *revoked* or *not renewed* without due process protections.  *Id.* at 609-10.  The reason for this rule is that the State has created a system by which there is a great likelihood that liquor licenses will be renewed, which is akin to the situation in *Perry v. Sindermann*, 408 U.S. 593, 599 (1972)) where the Court recognized a quasi-tenure system as giving rise to a protected property interest.  *Bundo v. City of Walled Lake*, 395 Mich. 679, 693 (1976).  By contrast, the mere application to transfer a liquor license does not amount to a protected property interest.  *Wojcik*, 257 F.3d at 610-11; *Royal Oak Ent., LLC v. City of Royal Oak*, 205 F. App'x 389, 396 (6th Cir. 2006).  Thus, under existing Sixth Circuit precedent, there is no question that Hakim, who never had an interest in Jon Jon's liquor license, was a mere applicant for its transfer, lacked any property interest in the

-14-

transfer and cannot assert a substantive due process right.  The question of whether Cerrito has a property interest in the liquor license which could not be transferred without due process protections presents a closer question as she was the actual holder of the liquor license.  An analysis as to the procedures employed to effectuate transfer answers the question.  Unlike renewal, there is no comparable system by which a transferor can expect that the transfer will take place as a matter of course.  Transfer requires approval by local law enforcement, the local legislative body, and the MLCC.  As in *Wojcik*, Cerrito can point to no official guarantees or implicit promises by the City or the MLCC that she would be entitled to transfer her liquor license to any person of her choosing.  Thus, she cannot show a legitimate property interest in the transfer of her liquor license.  In sum, having found that plaintiffs have failed to demonstrate a property interest in the transfer of Cerrito and Jon Jon's liquor license to Hakim, plaintiffs' substantive and procedural due process claims must be dismissed.

Although the general rule is that an individual must prove a protectable property interest in order to make a substantive due process claim, the Sixth Circuit has also recognized a substantive due process right may arise without such a deprivation where the governmental conduct "shocks the conscience," or fails to survive rational-basis review. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 861 (6th Cir. 2012) (citing *Valot v. S.E. Local Sch. Dist. Bd. of Educ. 107 F.3d 1220, 1228 (6th Cir. 1997)); see also N.I.P.P. Royal Oak, LLC v. City of Royal Oak*, 420 F. Supp. 2d 791, 799 (E.D. Mich. 2006). Rational basis review is a deferential standard which affords a strong presumption of validity.  *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005).  To survive such review, plaintiffs must show that the City's action was not rationally related to

a legitimate government interest.  *Valot*, 107 F.3d at 1228.  Here, the City Council's denial of plaintiffs' transfer application easily survives rational basis review.  The evidence presented to the Council suggested: (1) the transfer to Hakim was not an arms length transaction based on Sesi and Hakim's familial relationship, the timing of her application, and the fact that both were represented by the same counsel; (2) that Hakim would allow her uncle, Sesi, or her brother, Al-Hakim, to run, or at least, be involved in Jon Jon's operations, and Sesi and Al-Hakim had repeated liquor law violations at Cheetah's including allowing dancers to touch patrons' genitals and serving liquor to minors, and the City Council knew of allegations that sex trafficking was occurring at Cheetah's; (3) Hakim lacked experience operating an adult entertainment club; and (4) Jon Jon's risked losing its non-conforming use status based on its $800,000 construction project that was underway and financed by Sesi.  (Doc. 91-13 at 16-18).  Based on these legitimate concerns, the decision of the City Council to deny the transfer application passes rational-basis review.

In their Complaint, filed in June, 2010, plaintiffs asserted a violation of their substantive due process rights based on the City of Warren's failure to provide for standards for reviewing liquor license transfers in its local ordinances.  In response to defendant's motion for summary judgment, however, plaintiffs appear to have abandoned this argument, and assert for the first time, that ordinances passed in September, 2010 and May, 2013, support their substantive due process claim.  (Doc. 98 at 28-32). Specifically, plaintiffs rely on the September, 2010 ordinance which prohibits a sexually oriented business from allowing alcoholic beverage on the premises.  The constitutionality of that ordinance, passed six months after plaintiffs' transfer application was denied, is not

properly before this court as it was not and could not be a basis for the denial, and so was not referenced in the Complaint.

In their response brief, plaintiffs also claim that the City violated their substantive due process rights by failing to set forth the reasons for the denial as required by local ordinances passed in May, 2013. Those ordinances provide that the City Council shall issue a decision either approving or disapproving an application for a liquor license, and if denying the application, then the City Council shall provide one of the specifically enumerated reasons for the denial as set forth in Section 4-12(c). Section 4-12(c) contains sixteen reasons for denying an application, including a catch-all provision providing that approval of a liquor license may be denied if "the city council finds, based on specified information available to the division or council, that the applicant lacks the demonstrated ability to operate an alcoholic liquor-licensed establishment consistent with the public health, safety, and welfare." (Doc. 98, Ex. 16 at 5). The ordinance did not exist at the time plaintiffs' transfer application was denied and thus, is irrelevant.

Even if Section 4-12 applied and required the City Council to set forth its reasons for the denial in writing, constitutional notions of due process are not defined by local ordinances. The mere fact that governmental action may violate a local ordinance does not give rise to the conclusion that the procedures afforded to the plaintiffs were also constitutionally deficient. That is a separate inquiry and "[t]he requirements of procedural due process are measured against constitutional standards." *Chandler v. Village of Chagrin Falls*, 296 F. App'x 463, 472 (6th Cir. 2008) (internal quotation marks and citations omitted). The Supreme Court has explained that the question regarding what process is due is not answered by state law or local ordinances but by constitutional benchmarks.

-17-

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541-42 (1985).  The hallmarks of procedural due process are notice and an opportunity to be heard.  *Mathews*, 424 U.S. at 902.  There is no dispute here that plaintiffs had notice of the hearing regarding their transfer application, had the opportunity to be heard, and did in fact appear at the hearing, through counsel, and were allowed to speak and present their case.  For the reasons set forth above, plaintiffs have not raised a triable issue of fact as to whether their substantive and procedural due process rights have been violated.

Based on their response brief, plaintiffs have waived their claim that the City's lack of articulate standards for the transfer of the liquor license violated their substantive due process rights, and have waived their request that the court declare ordinance sec. 4-7, which has since been repealed, constitutionally vague.  Even if the court considers those claims, they do not survive summary judgment.  The Complaint claims that only one ordinance, Sec. 4-7, covers liquor license applications and it provides:

> Any person who has applied to the state liquor control commission for a dance and entertainment permit within the city limits shall obtain from the city clerk and answer, a questionnaire form, which form shall be approved by resolution of city council, prerequisite to the city council making recommendation on the state liquor control commission dance and/or entertainment permit.  The purpose of the questionnaire information furnished shall be to enable the city council to have the applicable information necessary to properly evaluate and make recommendation to the state liquor control commission.  The completed questionnaire shall be filed with the city clerk before the city council makes recommendation to the state liquor control commission.  Prior to any recommendation by the city council to the state liquor control commission the city council shall also afford to the person applying and completing and filing the questionnaire the procedural safeguards of notice and hearing before the city council.

(Doc. 1 at ¶ 110, quoting Warren City Ordinance 4-7).  Plaintiffs have failed to show that the City of Warren's ordinances or lack thereof deprived them of substantive due process

-18-

for two reasons.  First, as discussed above, plaintiffs have not shown that they even have a constitutionally protected property interest in the transfer of a liquor license.  Second, even if they had such a property interest, the City has shown that it had a legitimate governmental interest in denying the transfer application because of its concerns that Sesi or Al-Hakim, who had repeated liquor violations for their operation of Cheetah's, would be involved in the running of Jon Jon's.  Thus, even if the City's ordinances themselves did not provide identifiable standards for the transfer of a liquor license, the evidence shows that the City acted upon legitimate governmental interests when it denied Hakim's application.

## 2.      First Amendment Freedom of Speech Claim

Plaintiffs also claim that the City violated their First Amendment freedom of speech rights when it denied Hakim's application for the transfer of Jon Jon's liquor license with its entertainment permits.  Plaintiffs claim that the topless dancing that took place at Jon Jon's is a form of protected free expression, and that the City denied the transfer because it did not want adult entertainment in the City.  The City, on the other hand, contends that it denied the transfer application because of concerns over the secondary effects of adult entertainment.

The Sixth Circuit addressed a similar freedom of expression claim in *Wojcik* and affirmed the grant of summary judgment for the City of Romulus.  In that case, plaintiffs claimed that the City of Romulus violated their right to freedom of expression when it denied their application to transfer an entertainment permit that would have permitted topless dancing.  257 F.3d at 613.  The Sixth Circuit found that although some council members stated a general aversion to adult entertainment in the City, the City's refusal to

transfer the entertainment permit was justified as a reasonable restriction on time, place, or manner of protected speech because of the City's expressed concern that the bar was located within 500 feet of a church or school in violation of the city zoning ordinance.  *Id.* at 614.  The Court found that refusing to transfer the entertainment permit because of the bar's proximity to family oriented establishments was the narrowest means of vindicating the City's substantial interest in preventing the secondary effects of adult entertainment. *Id.*

As in *Wojcik*, the City has shown that its denial of the Hakim's application to transfer the liquor license and entertainment permits was a reasonable restriction on expressive conduct.  Although the City Council did not issue a formal written decision setting forth its reasons for denying Hakim's application, the Council's meeting minutes and Liss' deposition testimony set forth legitimate content-neutral reasons for the denial.  At the Council meeting, council member Liss expressed concerns that Hakim would allow her uncle, Sesi, who had repeated liquor license violations at Cheetah's, to own, partially own, or run Jon Jon's.  (Doc. 91-13 at 13-17).  The president of the Central Homeowners of Warren ("CHOW") appeared at the council meeting and expressed homeowners' concern that Sesi have any involvement in the operation of Jon Jon's.  (Doc. 91-13 at 15).  Although Hakim's counsel denied Sesi's involvement or ownership at the Council meeting, as it turns out, Liss' concerns were well founded as Cheetah's mortgage, rents, and UCC-1 property were listed as collateral for the bank loan to purchase Jon Jon's and make improvements for which Hakim was the guarantor.  (Doc. 91-14).

At the Council meeting, Liss also opposed the transfer application because the $800,000 allotted for improvements at Jon Jon's constituted a major structural change

-20-

which would violate the zoning ordinance. (Doc. 91-13 at 16). Once again, time proved these concerns were well founded as Jon Jon's later gutted its old building, leaving just a bare concrete slab and portions of a few exterior walls (Doc. 91-16), which the City's zoning inspector determined caused Jon Jon's to lose its nonconforming use status in August, 2010. (Doc. 91-8 at 3). That decision was later affirmed by the Macomb County Circuit Court. (Doc. 91-8 at 12).

In addition to concerns stated by council members on the record at the City Council meeting, Liss also testified that he opposed the transfer based on the secondary effects of sexually oriented businesses including noise in neighborhoods, prostitution, drugs, violence, crime, lack of peaceful enjoyment in neighborhoods, and the concern that the major renovations Jon Jon's anticipated would leave the establishment as a nonconforming use in violation of the zoning ordinances. (Doc. 91-9 at 22-23). Based on these legitimate concerns, the City has shown that its denial of Hakim's transfer application did not deprive plaintiffs' of their freedom of expression, but was a narrowly tailored restriction designed to serve the City's substantial interest in preventing the secondary effects of adult entertainment, to prevent the involvement of Sesi who had well documented problems of liquor violations at Cheetah's, and because Jon Jon's was likely to lose its nonconforming use based on the nearly million dollars it set aside to pay for improvements.

In its motion for summary judgment, the City also argues that plaintiffs' claim for *injunctive* relief to have the 2010 liquor license be stricken (R. 1 at 22) is moot as the City enacted a new liquor license in 2013 that does not contain the 2010 language. In their response, plaintiffs argue that the City's 2013 liquor ordinance, which prevents topless dancing at establishments serving alcohol, (Doc. 91-17) is an unconstitutional deprivation

of their right to free expression. (Doc. 98 at 33-36). The constitutionality of the 2013 liquor ordinance, however, is not properly before this court. Plaintiffs' transfer application was denied in 2010, their Complaint was filed in 2010, and they have not sought to amend the Complaint at any point over the past six years that this litigation has been pending. Accordingly, the constitutionality of the 2013 ordinance is not before this court, and cannot form any basis for plaintiffs' First Amendment claim.

### 3.    Race Discrimination

The court turns now to plaintiffs' race discrimination claims brought pursuant to the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment (Counts IV and V). Plaintiffs' race discrimination claim is properly analyzed under the Equal Protection Clause of the Fourteenth Amendment only. The Supreme Court has instructed as much, ruling that "[w]here a particular Amendment provides an explicit source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation marks and citations omitted). In order to prove race discrimination under the Equal Protection Clause, plaintiffs must prove "racially discriminatory intent or purpose." *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (internal citations omitted). The evidence may be indirect or circumstantial, provided that it at least demonstrates "a clear pattern" of government action that is "unexplainable on grounds other than race." *Arlington Heights v. Metro. Hous. Dev'p Corp.*, 429 U.S. 252, 266 (1977). Plaintiffs have failed to meet their burden here.

-22-

Plaintiffs rely on a number of things to support their claim that they were denied the liquor license transfer because they are of Chaldean consent, but none are persuasive. First, they rely on Sesi's and Hakim's deposition testimony that they felt the City Council denied the transfer because of their race.  However, their personal feelings that the transfer denial was racially motivated are nothing more than rank speculation.  Second, they point out that the City provided no formal decision setting forth the reasons for the denial.  But as discussed above, the meeting minutes and Liss' deposition testimony provide non-discriminatory and legitimate reasons for the denial.  Third, they contend no other liquor license or transfer applications were denied in 2009-10.  However, plaintiffs have presented no record evidence about others who have received City approval to transfer stock in a liquor-licensed business and thus, there is no basis for evaluating whether they were treated differently than similarly situated applicants.

Fourth, plaintiffs rely on census statistics to point out that no Arab Americans lived in Warren in 2010.  However, statistics about the racial composition of City residents does not give rise to an inference council members denied plaintiffs' liquor license transfer application because they are Chaldean.  Fifth, plaintiffs point out that the City was found liable for race discrimination against African Americans in its municipal recruitment practices in 1998, for disability discrimination in 2008, and for height discrimination in 1985. Clearly, the disability and height discrimination claims are wholly irrelevant to the constitutional issues at stake here.  As to the 1998 Title VII race discrimination case involving whether the City's methods of hiring municipal workers had a disparate impact on African Americans, *United States v. City of Warren*, 138 F.3d 1083 (6th Cir. 1998), that case is remote in time, and involved claims arising from different decision makers, a

different suspect class, and radically different claims.  Surely, plaintiffs cannot bootstrap the unrelated 1998 Title VII case brought on behalf of African Americans, to support their claims of race discrimination here.

Finally, the court considers plaintiffs' claims that Liss was out to get them and attempted to turn council members against their transfer application based solely on their race.  In support of this theory, plaintiffs rely on a web posting by Liss in March, 2010, which questions Hakim's relationship to Sesi and asks whether Jon Jon's will become the new Cheetah's (Doc. 98 at Ex. 12).  Plaintiffs also rely on Liss' letter in November, 2009, to the MLCC reporting a suspected violation of the liquor code because Jon Jon's failed to report a transfer of nine percent of the stock of Jon Jon's to Sesi.  (Doc. 98, Ex. 9). Records from the MLCC show that Jon Jon's filed the proper paperwork in response to the complaint, and the complaint was closed.  (Doc. 98, Ex. 10).

Plaintiffs also rely upon a letter Liss wrote to MLCC chairperson Nida Somona on November 23, 2009, expressing his concern that Jon Jon's failed to notify the Commission of the partial transfer of shares to Sesi and seeking an investigation into the matter.  (Doc. 98, Ex. 11).  On November 28, 2009, Liss posted on his website the fact that he had requested the investigation into the stock transfer, and also reported that a sale of Jon Jon's to Hakim was pending.  (Doc. 98, Ex. 1).  In that same posting, Liss stated that Sesi had applied to buy-out the remaining shares of Jon Jon's, the Warren police recommended against the transfer, and Sesi removed his request.  *Id.*  The posting noted that it was unclear if Sesi would retain partial ownership, and stated that Sesi is the owner of Cheetah's which has been fined and suspended by the MLCC four times, the last for

-24-

allowing dancers to make genital contact with customers, and noted that the NBC Today show had done a expose about sex trafficking that involved Cheetah's. *Id.*

These letters and internet postings by Liss reveal his concerns that Jon Jon's would become another Cheetah's, and that Sesi was somehow involved in the sale to Hakim. There is nothing to suggest that Liss opposed the transfer because Hakim and Sesi were Chaldean. Rather, the letters and postings show that Liss was concerned that Jon Jon's would be compromised if its ownership were changed to allow involvement by the owner of another strip club with well documented and repeated liquor violations, and where Ukranian women had been forced to strip against their will. Plaintiffs have not shown that Liss' concerns about Sesi's partial ownership or involvement in Jon Jon's were a ruse to disguise racial animus. For these reasons, plaintiffs have failed to raise a triable issue of fact that the City denied their transfer request because of racial bias and the City is entitled to summary judgment on their race discrimination claims.

**4.    "Class of One" Discrimination**

In addition to their race discrimination claim, plaintiffs also assert a "class of one" claim alleging that they were treated differently than others who were similarly situated without any rational basis for the difference in treatment or that the different treatment was motivated by animus or ill-will. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564; *Bower v. Village of Mount Sterling*, 44 F. App'x  670, 677 (6th Cir. 2002). Unlike the heightened scrutiny that applies to race based claims, to prove a "class of one" claim requires the lowest level of constitutional scrutiny and the City's decision will only be found deficient if plaintiffs prove that (1) they have been "intentionally treated differently from

-25-

others similarly situated," and (2) "there is no rational basis for the difference in treatment."
*Olech*, 528 U.S. at 564.  Plaintiffs have failed to satisfy either prong.  First, they have failed
to show any evidence about others who received City approval to transfer stock in a liquor
licensed business, and certainly have not shown that plaintiffs are similar "in all relevant
respects."  *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015).  Second, plaintiffs
have failed to show the City lacked any rational basis for its decision or that the decision
was based on animus.  *See Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005).
For reasons discussed previously in this opinion, the City had a rational basis for denying
the transfer request.

**E.     Supplemental State Law Claims**

Having granted summary judgment for the City on all federal claims, this court
declines to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to
28 U.S.C. § 1367(c)(3).  "When all federal claims are dismissed before trial, the balance
of considerations usually will point to dismissing the state law claims, or remanding them
to state court if the action was removed."  *Musson Theatrical v. Fed. Express Corp.*, 89
F.3d 1244, 1254-55 (6th Cir. 1996).  In a case that has been removed, "when all federal
claims have been dismissed before trial, the best course is to remand the state law claims
to the state court from which the case was removed."  *Thurman v. DaimlerChrysler, Inc.*,
397 F.3d 352, 359 (6th Cir. 2004).

**IV. Conclusion**

For the reasons set forth above, defendant's motion for summary judgment (Doc.
91) is GRANTED as to all federal claims as set forth in Counts IV- IX .   Count III is

DISMISSED based on plaintiffs' stipulation.  Plaintiffs' state law claims set forth in Counts I and II are REMANDED to Macomb County Circuit Court in case no. 10-2320-CZ.

**IT IS SO ORDERED**.

Dated:  February 16, 2016

s/George Caram Steeh_____
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 16, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---